**Richard J. Moore, Charles P. Molthrop, Appellee, v. New York, Chicago & St. Louis Railroad Company, commonly known as Nickel Plate, Appellant.**

## Gen. No. 31,375.

1. ATTORNEYS AND COUNSELORS—*service on corporation of notice of lien.* Service of notice of an attorney's lien must be personal and service thereof upon the attorney for a corporation will not suffice.

2. ATTORNEYS AND COUNSELORS—*service on agent of notice of lien.* Service of notice of an attorney's lien upon one who signed as agent without adding for whom, but on a notice addressed to the corporation and to him as its agent, in absence of denial of the signature or of his authority as agent, will be held valid.

3. APPEAL AND ERROR—*objection to attorney's lien notice not raised until appeal.* A corporation cannot object on appeal to the service of a notice of attorney's lien upon them after permitting the notice and receipt by their agent to be introduced in evidence without objection at the trial.

4. ATTORNEYS AND COUNSELORS—*lien under unsigned contract.* An attorney's acting upon a contract of employment obviates the necessity of his signing it before he serves notice of lien upon the defendant to his client's action.

5. CHAMPERTY AND MAINTENANCE—*attorney's employment at instance of mutual acquaintances.* Persuading an acquaintance to employ an attorney who is one's friend or own attorney does not constitute champerty and maintenance.

6. CHAMPERTY AND MAINTENANCE—*paid investigator of attorney securing contract of employment of latter.* That one hired by an attorney as investigator on a *per diem* basis secures for him a contract of employment from one who had already been persuaded to consult the attorney by friends and client, does not constitute champerty and maintenance, there being no arrangement between the attorney and his investigator for a division of the fee.

7. CHAMPERTY AND MAINTENANCE—*attorney's advancing costs and expenses.* A contract of employment of an attorney on a share basis which was silent as to expenses of the action was not champertous even though the attorney advanced court costs and expenses on the theory that the client would repay him.

Appeal by defendant from the Superior Court of Cook county: the Hon. HUGO PAM, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1926. Affirmed. Opinion filed June 13, 1927.

GLENNON, CARY, WALKER & MURRAY, for appellant; SIDNEY C. MURRAY and MARVIN A. JERSILD, of counsel.

ROSE & SYMMES, for appellee.

MR. JUSTICE THOMSON delivered the opinion of the court.

By this appeal the defendant Railroad Company seeks to reverse a judgment for $2,541.67, recovered against it in the superior court of Cook county by C. P. Molthrop on an intervening petition filed by the latter, wherein he claimed the amount recovered, pursuant to the provisions of an agreement between him and the plaintiff, Moore, in which the latter retained Molthrop to represent him as his attorney, in a claim for damages against the Railroad Company, agreeing to pay said Molthrop one-third of any amount that might be recovered on said claim, either as a result of a suit or compromise.

Charles P. Molthrop is a practicing lawyer in the City of Chicago. Moore was injured in a wreck which involved one of the trains of the defendant company in the State of Indiana. He was taken to a hospital at Gary, Indiana. At that time there was another patient in the hospital whose name was Stroud. He had also been injured and had a claim pending against another railroad, and Molthrop was representing him in the prosecution of his claim. One Stabb was apparently a friend of Stroud and went to the hospital to see him frequently. Stabb was also an old client of Molthrop who had represented him in some similar litigation about 12 years before. A day or two after Moore was taken to the hospital he asked Stroud what he was there for and the latter said he had been hurt and had a suit pending in Cook county. Moore asked him who his lawyer was and he told him. Moore then said: "I wonder if he would take my case or whether it could be sued in Illinois." Stroud said he did not know but that his friend Stabb would be in to see him and that this same lawyer had represented Stabb at one time and that Stabb could probably give the information he was seeking. The next time Stabb came in to see Stroud they both went to see Moore, who then repeated about the same conversation he had previously had with Stroud. Stabb then told Moore that he did not

know what the situation was but that he would call up Molthrop and find out. Stabb later called Molthrop over the telephone and asked him if he could come to Gary and talk with Moore. Molthrop replied that his engagements here were such that he could not do that but that he would send a man named Davis who had been in his employ for 12 or 14 years. At Molthrop's direction Davis went to Gary and had a talk with Moore, which resulted in Moore signing a power of attorney employing Molthrop as his lawyer and authorizing him to represent him in connection with his claim against the defendant. This power of attorney was executed on September 17, 1924. It provided that Molthrop's compensation was to be on a contingent basis—he to receive nothing in case nothing was realized on the claim but if anything was realized then he was to receive one-third of the amount recovered, either by suit or compromise—and by the terms of the power of attorney, Moore directed the defendant to pay one-third of any sum that might be determined upon by way of settlement, to Molthrop. When Davis returned from Gary with this power of attorney, he delivered it to Molthrop, who later directed Davis to go to the scene of the accident and take certain photographs, and investigate the matter thoroughly. Davis proceeded to make this investigation and was gone a week or ten days on that work, interviewing everybody he could find in the locality where the wreck occurred, who could give any information. On October 17, 1924, Molthrop served written notice on the defendant of his agreement with Moore, which notice contained a copy of that agreement in full. This notice was addressed: "To New York, Chicago and St. Louis Railroad Company, commonly known as Nickle Plate, and W. H. Cunningham, Assistant General Freight Agent, and Glennon, Cary, Walker & Murray, 536 La Salle Station, Chicago, Illinois, Attorneys for said railroad." This notice advised the parties that Molthrop claimed a lien

for his services rendered and to be rendered in the matter of Moore's claim against the railroad company, "pursuant to statute in such case made and provided." The original of this notice, as introduced in evidence in the trial court, contained an acknowledgment of its receipt by the parties to whom it was addressed, said acknowledgment being as follows:

"Received a copy of the above notice this 17th day of October, A. D. 1924.

"Glennon, Cary, Walker & Murray,

"Attorneys for New York, Chicago & St. Louis Railroad Company.

        "W. H. Cunningham,

            "Assistant General Freight Agent."

On October 30, 1924, Molthrop instituted an action at law in the name of Moore against the defendant railroad company, in the superior court of Cook county. Summons was duly issued and served on "E. T. Glennon, Agent." The plaintiff's declaration was filed on December 24, and on January 6, 1925, a plea of the general issue was filed by "Glennon, Cary, Walker & Murray, Attorneys for Defendant."

It appears from the record that Moore had no funds and Molthrop advanced the court costs. He also had Moore brought to Chicago and had him examined by several doctors and had some X-ray photographs taken, and Molthrop advanced the costs in that connection also. In the course of time there were a number of conferences between Molthrop and both the local and general claim agents of the defendant, with a view to the possible settlement of Moore's claim. Moore was unwilling to accept less than $15,000, and the highest offer the claim agents made was $8,000 or $9,000. Moore intimated that he might be willing to take $12,000, but they were unable to get any nearer together. The case reached the trial call and was set at the head of the call for December 14, 1925. The last conference between Molthrop and the claim agents

occurred about December 5 or 6, 1925. On December 9, Molthrop received a letter from his client advising him that he had settled his case and did not consider that he owed Molthrop anything. Molthrop then sent Davis down to Indiana to see what had happened and discovered that on December 7, a suit had been instituted in Moore's behalf against the defendant, at Fort Wayne, Indiana, based on this claim, and on the same day a judgment had been entered in Moore's favor for $7,625, and costs, which judgment had been satisfied in full. Molthrop then filed his intervening petition in the superior court case, wherein he claimed that the defendant company was indebted to him to the extent of one-third of the amount of the settlement which had been put through by the railroad company with Moore, under the provisions of the Attorney's Lien Act, Cahill's St. ch. 13, ¶ 13. Evidence was submitted by the respective parties to the trial court, at the conclusion of which the court made a finding for the intervening petitioner and entered the judgment appealed from.

In support of its appeal the defendant contends that the petitioner failed to either allege or prove proper service of notice of his lien upon the defendant as required by statute. It has been held that the service of a notice for attorney's lien must be personal service, as the law prescribes in the case of service of process; that the personal service of such notice should follow the law as to the service, where the party is a corporation; and that, therefore, service of such notice upon an attorney for the party against whom the lien is sought to be enforced is not sufficient. *Jackson v. Toledo, St. L. & W. R. Co.*, 186 Ill. App. 531; *Reynolds v. Alton, G. & St. L. Traction Co.*, 211 Ill. App. 158. As to the service of the notice on Cunningham, it is contended that the petition alleges service upon "W. H. Cunningham, Assistant General Freight Agent," but does not allege that Cunningham was the Assistant

General Freight Agent of the defendant company. In our opinion this contention is without merit. The notice is addressed to the defendant railway company by name "and W. H. Cunningham, Assistant General Freight Agent," and receipt of the notice so addressed is signed "W. H. Cunningham, Assistant General Freight Agent." No contention is made to the effect that the signature of Cunningham is not his genuine signature, or that he, in fact, is not the Assistant General Freight Agent of the defendant railway company. Moreover, we are of the opinion that the defendant is in no position to raise a question as to the sufficiency of the notice here. In its answer to the petition the defendant made a general denial of service as alleged in the petition, but when the proof was being put in, service of the notice was practically conceded. The petitioner was on the stand and without objection testified that he caused this notice to be served on Glennon, Cary, Walker & Murray, and also on Cunningham, Assistant General Freight Agent. The notice was then produced and offered in evidence, counsel for petitioner remarking: "This, I think, has their signature on it," whereupon counsel representing the defendant said: "That is all right," whereupon the notice, with the acknowledgments of receipt of notice, was received in evidence, without objection. The notice of claim for lien was not admissible unless it had been served upon the defendant, as the statute requires. In view of the circumstances referred to above, the defendant is not in a position to contend now that the service of the notice was defective.

The defendant contends further that the petitioner is not in a position to enforce his lien because there was no valid contract existing between him and the plaintiff at the time the petitioner served notice of his lien, as claimed by him, on October 17. In our opinion, the record demonstrates the contrary. The signature of Molthrop was not necessary to complete the contract

between him and the plaintiff, nor in order to consti-
tute a complete and binding contract between them was
it necessary that Molthrop expressly assent to it after
Moore had signed it.  It became a complete and bind-
ing contract as soon as Molthrop acted under it, which,
under the undisputed evidence, was as soon as Davis
returned to Chicago with it.  Molthrop testified that
when Davis brought back the power of attorney signed
by the plaintiff, "I instructed Mr. Davis to then com-
mence preparation of this case and investigate it thor-
oughly."  He then testified that Davis proceeded to do
so, consuming a week or ten days in his investigation.
There can be no question of the fact that under the
evidence in this case Molthrop acted under his contract
of employment prior to the date of notice of the lien.
On that date there was, therefore, a binding contract
between him and his client.

The defendant contends further that the contract
between Molthrop and the plaintiff will not support an
action for the recovery of attorney's fees, because it
was the result of acts constituting maintenance and
champerty.  In our opinion, the evidence in this record
fails to show that anything was done by Molthrop
which was in any way improper in bringing about his
employment by the plaintiff in this case.  Both Stabb
and Stroud were clients of Molthrop, and, according
to the uncontradicted evidence, Moore learned about
Molthrop by asking Stroud what he was in the hospital
for, and Stroud told him he had been injured and that
he had a lawyer who was representing him in a claim
he had, and that this lawyer was the petitioner.  The
only witness other than the petitioner was the plaintiff
and he gave no evidence to the contrary.  He testified
that he first saw Davis in the hospital at Gary and that
Davis told him he was representing a firm of lawyers
and advised him to have some one investigate his case
immediately; that he told Davis he didn't want any-
body right then, until he had talked it over with his

wife; that his wife came to see him the next day and he talked the situation over with her and thought it would be advisable to have some one; that he saw Davis again that afternoon and signed the contract and power of attorney and told Davis how the accident happened. He said that he did not send for Davis but that he had talked with Stabb and the latter told him that Molthrop was representing Stroud, who was then in the hospital, and that he thought Molthrop was a very good lawyer and that one of his representatives was coming over to see Stroud shortly and he would have him come up to see Moore, and later Davis came in. Moore admitted on cross-examination that he knew Stroud at the hospital and had visited with him.

In our opinion there is nothing shown by the evidence in this case which would constitute champerty. The evidence shows that Davis was a member of the Brotherhood of Railway Trainmen. For some 10 or 12 years he had been in the employ of Molthrop as an investigator on a *per diem* basis. Neither Stabb nor Stroud were in Molthrop's employ. Moore was without funds and had a wife to support. Apparently he and Davis became friendly and Davis loaned him various amounts aggregating ultimately something between $700 and $800. As Davis made these loans to Moore the latter gave Davis judgment notes. This course of dealing between Davis and Moore was unknown to Molthrop until some months after the transactions had taken place. There was no arrangement between Davis and Molthrop concerning a division of fees in this case.

The fact that Molthrop advanced the court costs when this case was instituted against the defendant company and that he also advanced certain expenses incident to the X-ray photographs and possibly the fees of the doctors who examined the plaintiff in Chicago (although the latter is not clear from the record) in our opinion, would not make out a case of cham-

perty. The contract between the parties was silent on the question of court costs or other necessary incidental expenses, and Molthrop testified that no express arrangement had been made between him and the plaintiff in regard to the question of defraying the expenses of the litigation. On the evidence in this record it would seem to be entirely clear that the amounts Molthrop paid out were advancements made by him in behalf of his client, for which the latter would be liable. Before a case of champerty will be made out, it must be shown that a lawyer entered into an agreement with his client to represent him in certain litigation and agreed to pay the costs and expenses of the litigation himself. Such is not the case where the lawyer makes advancements of these amounts for his client's use. 11 C. J. ¶ 27, p. 245; *Christie v. Sawyer*, 44 N. H. 298; *Wallace v. Chicago, M. & St. P. Ry. Co.*, 112 Iowa 565. In the *Christie* case the court said: "So long as the law gives countenance and encouragement to the employment of attorneys and counsel, to aid suitors in the prosecution and defense of their supposed rights, it cannot be deemed maintenance for professional men to render their services to those who need them, for the usual and customary compensation. Nor is it material whether the party is in good credit, and able to pay for those services, as the case proceeds, or the counsel has to rely for his compensation upon the success of a cause he believes well founded. It is usual, and in many cases unavoidable, that the expenses incident to a controversy are paid by the attorney in the cause. Such advances are constantly recovered in actions for costs, and there can be no pretense that the payment of such proper and legal expenses, in good faith, constitutes maintenance, whether they are expected to be paid at once, or from the proceeds of the cause." Quoting from *Shapley v. Bellows*, 4 N. H. 355, the court went on to say: "It is not uncommon that attorneys commence

actions for poor people, and make advances of money necessary to the prosecution of the suit, upon the credit of the cause. Thus a man in indigent circum-stances is enabled to obtain justice in cases where, without such aid, he would be unable to enforce a just claim.'' The court also quotes another authority with approval, to the effect that ''there is no doubt but that an attorney may lawfully prosecute or defend an action in the court, wherein he is an allowed attorney, in behalf of anyone by whom he shall be especially retained, and that he may assist his client by laying out his own money for him, to be repaid again.'' In the *Wallace* case it was not denied that the lawyers involved had made advancements in the way of paying the filing fee which was due when the case was instituted, and for the attendance of witnesses and for other necessary expenses incident to the preparation and trial of the case, ''but,'' the court said, ''this is not sufficient evidence of an illegal and immoral contract, for but few cases of any kind are handled by the most exact and conscientious of the profession where they are not called upon to do many or all of the things complained of here, and where they do not hesitate to make these advancements without thought of wrong, and in most instances without thought of how or when repayment will be made.''

Counsel have called our attention to *North Chicago St. R. Co. v. Ackley,* 171 Ill. 100. The question there presented for the decision of the court was whether a cause of action arising from a tort was assignable, and the court held that it was not. In the course of a dissenting opinion the member of the court who wrote that opinion referred to the fact that it was claimed that an agreement which was there involved violated the rule against maintenance and champerty. A lawyer was a party to that agreement and its terms were such that the client expressly agreed to pay the court costs and necessary expenses. It was also agreed that a

part of the thing recovered was to be paid as attorney's fees. The court said that the latter was not sufficient to make out a case of champerty, but "it must also be shown that the costs and expenses of the suit, or some part of them, are paid or agreed to be paid by the attorney." Aside from the fact that what the court there said is found in a dissenting opinion, we believe that it may not reasonably be made to apply to costs or incidental expenses advanced by the attorney for the use of his client. The writer of the dissenting opinion in the case referred to, cited *Thompson v. Reynolds,* 73 Ill. 11; *West Chicago Park Com'rs v. Coleman,* 108 Ill. 591; and *Phillips v. South Park Com'rs,* 119 Ill. 626. In the *Thompson* case, the lawyer entered into an agreement with his client to institute all necessary proceedings to ascertain and fix the rights of the latter, and in that connection the lawyer agreed "that he should pay all necessary expenses, and receive one-half of whatever should be realized." That contract was held to be champertous and void. In the *Coleman* case, the record failed to show that the attorneys involved had undertaken to pay any part of the client's expenses or costs in the maintenance of certain litigation, which the court held was a complete answer to the claim that the contract involved was champertous. The court quoted Chitty on Contracts (10th Am. Ed.), page 754, where that author defines champerty to be: "A bargain with a plaintiff or defendant to divide the land or other matter sued for, between them, if they proceed at law, whereupon the champertee is to carry on the party's suit at his own expense." In the *Phillips* case, the court said that the contract there involved, "lacked one essential element to render it champertous, and that is, that the attorneys should prosecute the litigation at their own costs and expense. Had the contract provided that the attorneys should carry on the litigation for a share of what they might recover, at their own cost and expense, then the

20     APPELLATE COURTS OF ILLINOIS.

contract might have been champertous and void. (Citing the *Thompson* case and the *Coleman* case.) Such, however, is not the case. The written contract, which alone fixes and determines the rights and duties of the parties, contains no provision whatever requiring the attorneys or the park commissioners to pay the costs or expenses of the litigation. The fact that the park commissioners may have advanced Phillips money which was used in the prosecution of the litigation, has no bearing on the question.''

For the reasons we have given, the judgment of the superior court is affirmed.

*Judgment affirmed.*

TAYLOR, P. J., and O'CONNOR, J., concur.